J-S17019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| OMEGA PEOPLES | : | |
| | : | |
| Appellant | : | No. 341 EDA 2018 |

Appeal from the PCRA Order December 13, 2017
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0004185-2011

BEFORE:  BENDER, P.J.E., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED APRIL 29, 2019**

Appellant, Omega Peoples, appeals from the order entered on December 13, 2017, denying him relief on his petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  In this appeal from the denial of PCRA relief, Appellant's court-appointed counsel filed a petition to withdraw as counsel and a no-merit brief pursuant to **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988) and **Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).  As we conclude that counsel fulfilled the procedural requirements of **Turner**/**Finley** and that this appeal is without merit, we grant counsel's petition to withdraw and affirm the PCRA court's order denying Appellant post-conviction relief.

In Appellant's direct appeal from his judgment of sentence, we quoted the trial court's thorough summary of the evidence presented at Appellant's trial:

The evidence showed that[,] . . . on May 22, 2006, the victim, Odell Cannon [("Cannon")], was approached by two assailants as he exited a house located at 712 East Chestnut Street in the City of Coatesville, Chester County, [Pennsylvania]. The assailants approached from two directions, Teron Lewis [("Lewis"), Appellant's] co-conspirator, from the front of that property, and [Appellant], from Diamond Alley, which abuts the rear of that property. The Commonwealth's evidence proved Lewis shot Cannon six times as Cannon walked through the side and backyard toward Diamond Alley. Lewis then fled the scene.

Within minutes after the shooting, [Appellant] was found nearby, wounded and hiding under a minivan parked next to Diamond Alley, the alley that bordered the back yard of the 712 East Chestnut Street property, where the shooting occurred in a side yard. The victim, Cannon, a convicted felon, was wearing body armor, and was armed with a Sturm Ruger .357 Magnum revolver, from which the Commonwealth's evidence proved he fired six rounds at his assailants. From the evidence, the jury could properly infer that [Appellant], who was shot three times during the encounter [with] Cannon, and unable to flee, was purposely trying to hide nearby from police, who had descended in force upon the shooting scene and the surrounding area.

Within arm's reach of [Appellant,] in front of the minivan[,] police found a loaded and fully operable Bryco Arms 9mm semi-automatic handgun, a glove, and a hunting mask, not typically found in one's possession on a May evening. Testing revealed [Appellant's] DNA was located on the mask, around the nose and mouth openings. Admittedly, the 9mm handgun belonged to [Appellant], but had not been discharged. On the night of the shooting, police also recovered from under the minivan one electric-blue, slip-on type sneaker, which they found lying next to [Appellant]. The matching sneaker was not under the van. However, the matching electric-blue sneaker was found by police that same night at the scene of the shooting in the backyard of 712 East Chestnut Street.

From testimony supplied by an FBI agent involved on [Appellant's] federal prosecution, the matching pair of electric blue sneaker-shoes belonged to [Appellant]. Lewis,

- 2 -

[Appellant's] co-conspirator, was subsequently convicted following a separate trial of attempting to murder Cannon and conspiring with [Appellant] to do so, as Cannon walked through the backyard of 712 East Chestnut Street, accompanied by a female companion, Mona Perez, who ran from the scene, but was later that morning identified by police and testified at trial against both [Appellant] and Lewis. [Appellant's] matching blue sneaker was found in the yard in immediate proximity to where Cannon was found wounded, placing [Appellant] within feet of Cannon during the attempted murder.

Adding to this evidence were several proven facts: (1) that Cannon, wearing body armor and armed with a Sturm Ruger .357 Magnum revolver, engaged in gunfire with his assailants, discharging all six rounds in his weapon; (2) the victim, Cannon, was shot six times, resulting in severe injuries, including the complete fracture of his left femur immediately proximate to the pelvic socket, which required mechanical repair, another bullet narrowly missed Cannon's left femoral artery, another bullet was lodged just above Cannon's bladder, and he suffered several bullet wounds to his thighs. Cannon was flown to the University of Pennsylvania for immediate surgery following the shooting; (3) when [Appellant] was found by police hiding under the minivan, police observed he had just been shot three times in the upper chest, sustaining three linear wounds that extended from his left nipple to his right shoulder, the angle of the wounds suggesting they were fired from Mr. Cannon's .357 Magnum revolver as Cannon lay wounded on the ground; (4) an hour before the shooting, [Appellant] and Lewis, his [co-conspirator], allegedly his "young boy" (a street name for a protégé) spoke by phone when Lewis, having just encountered Cannon at the 712 East Chestnut Street residence, called [Appellant] to inform him that Cannon was there. The shooting took place about an hour later; (5) the Commonwealth presented evidence as to the motive for the shooting, which was retaliation for an attempt made on [Appellant's] life a few days earlier by an associate of Mr. Cannon, identified by the prosecuting attorney as Mr. Cannon's "young boy," . . . stemming from a continuing feud among two rival Coatesville factions.

*Commonwealth v. Peoples*, 93 A.3d 507 (Pa. Super. 2013) (unpublished memorandum) at 1-4, *appeal denied*, 95 A.3d 277 (Pa. 2014), *quoting*, Trial Court Opinion, 3/27/13, at 7–10 (some corrections omitted).

The jury found Appellant guilty of attempted murder, aggravated assault (serious bodily injury), aggravated assault (use of a deadly weapon), conspiracy to commit murder, conspiracy to commit aggravated assault, and recklessly endangering another person.[1] On June 21, 2012, the trial court sentenced Appellant to serve an aggregate term of 18 to 36 years in prison for his convictions. We affirmed Appellant's judgment of sentence on December 11, 2013 and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on July 8, 2014. *Commonwealth v. Peoples*, 93 A.3d 507 (Pa. Super. 2013) (unpublished memorandum) at 1-20, *appeal denied*, 95 A.3d 277 (Pa. 2014).

On December 22, 2014, Appellant filed a timely, *pro se* PCRA petition. Within the petition, Appellant claimed that he was entitled to relief because exculpatory evidence, that was unavailable at the time of trial, had recently become available and would have changed the outcome of his trial if it had been introduced. **See** 42 Pa.C.S.A. § 9543(a)(2)(vi); Appellant's *Pro Se* PCRA Petition, 12/22/14, at 4-15. Specifically, Appellant claimed that his brother, Duron Peoples, recently admitted that he – and not Appellant – had committed

_____

[1] 18 Pa.C.S.A. §§ 901 (and 2502(a)), 2702(a)(1), 2702(a)(4), 903 (and 2502(a)), 903 (and 2702(a)), and 2705, respectively.

the crimes for which Appellant was convicted. Appellant's *Pro Se* PCRA Petition, 12/22/14, at 4-15.

Appellant attached a newspaper article to his petition, where Duron Peoples was quoted as declaring:

> After Keith Brown got shot I pretty much took things into my own hands, with [Cannon] and [Appellant]. . . . Before, I was about money. But it just got to be that way, and when blood got shed and [Keith Brown] died then the gloves was off.
>
> . . . Truth be told, I basically lured [Appellant] down there as a setup. I had called him and told him that I was under attack, which was a fabricated statement. When he came down I was already in the process of setting up [Cannon], basically going to kill him. [Appellant] was going to get caught up in that too.
>
> I'm the one who had [Cannon] shot. . . . Even though probably my family will be mad at me but I had [Appellant] shot too. The gun that he had I knew was a faulty gun. It was a faulty gun. It was the same one that shot Sonny on April 1, the same gun. It's nothing to be proud of.

Michael P. Rellahan, *Coatesville Murderer Duron Peoples Speaks From Prison of Past and Coming Life*, DAILY LOCAL NEWS, Oct. 23, 2014, *available at* https://www.dailylocal.com/news/national/coatesville-murderer-duron-peoples-speaks-from-prison-of-past-and/article_18c4fc8b-608c-5782-b2ec-f8b88a5e1f17.html (quotations omitted).

At the time Duron Peoples allegedly made the above statements, he was serving a term of life in prison without the possibility of parole for the October 21, 2006, first-degree murder of Jonas Suber. ***Id.***; ***see also*** N.T. PCRA

Hearing, 4/28/17, at 25 and 36; *Commonwealth v. Peoples*, 134 A.3d 110 (Pa. Super. 2015) (unpublished memorandum) at 1-11.

The PCRA court appointed counsel to represent Appellant; counsel later filed an amended petition on Appellant's behalf. The amended petition reiterated Appellant's claim of after-discovered evidence. *See* Amended PCRA Petition, 9/7/16, at 1-7.

On April 28, 2017, the PCRA court held a hearing on Appellant's petition, where Duron Peoples was the sole witness. The PCRA court ably summarized Duron Peoples' testimony:

> Duron Peoples testified under oath to the following: that he hired two individuals, whom he refused to identify, to kill both [Appellant], who is his older brother, and Odell Cannon. According to Duron's rendition of events, the killings were attempted on the night of May 22, 2006. Duron first disclosed these events to the reporter, Michael Rellahan. . . .
>
> [According to Duron, Appellant] knew nothing about Duron's plan to kill him, and [Appellant] . . . was not involved in the shooting of Odell Cannon, except in [Appellant's] capacity as an intended target. Duron made no disclosures to [Appellant] or anyone else about Duron's version of events, either prior to, during [Appellant's] prosecution for attempting to kill Odell Cannon, or thereafter, until contacting Rellahan. Duron testified that he "masterminded the whole operation." . . .
>
> Prior to the shooting, Duron had not spoken to [Appellant] for 11 years. Duron claim[ed] to have never bonded with [Appellant] during childhood due to their age difference and their later periods of incarceration[.] Duron testified that [Appellant] "didn't see things my way." From Duron's perspective, "it's my way or the highway[] . . . you go against me, you done." Duron denied that he was testifying on [Appellant's] behalf. [Duron testified:] "I ain't testifying for him for nothing. I don't care what happens whether he gets

- 6 -

any type of relief or anything like that. This is more for my family."

On cross-examination, Duron was questioned about how he lured [Appellant] to the scene of the shootings. He testified that he called [Appellant] and told him he needed "some assistance," and that he was behind their aunt's house that backed on Diamond Alley and needed [Appellant] "to come out at me." It is noted that Duron did not include the latter information in his disclosure to either Rellahan or in his letter to [Appellant's attorney]. . . .

Duron testified that the [9-millimeter] hand gun recovered by police from [Appellant] at the shooting scene was one he had stashed in his aunt's garage, that he conjectured [Appellant have known] where Duron hid things in his aunt's garage and might [have gotten] and [made] use of the gun in coming to Duron's aid. Duron testified the gun was the one used in the 2006 murder of Jonas Suber, a Coatesville barber with whom Duron had a dispute. Duron was convicted of Suber's murder on or about October 1, 2014, and was sentenced by the jury to life in prison. . . .

Duron testified that this gun "did not work well," thereby inferring it would be of no use to [Appellant] in defending himself from Duran's alleged plot to kill [Appellant]. Contrary testimony was offered at [Appellant's] trial to the effect [that] the [9-millimeter handgun] recovered from [Appellant] was operable and test-fired by police.

Duron was also questioned closely by the Commonwealth's attorney about his propensity to take responsibility for other's crimes after the statute of limitations has expired. Duron scoffed at the suggestion, saying he had nothing to lose and no motive to lie. In his words, "I'm not getting nothing out of this. . . . I still have to go back and finish this life sentence and get prepared to get buried in the back of the prison that I live at."

. . .

[During the hearing, the Commonwealth introduced a] transcript of [Appellant's] testimony at his 2007 federal trial for felonious possession of the [9-millimeter] handgun. . . .

- 7 -

> There, [Appellant] testified that on the night of Odell Cannon's shooting, he had been visiting his daughter's mother's house on 8th Avenue, near Diamond Alley and was headed to a bar from there. He did not testify to receiving a phone call from his brother, Duron, seeking his help, and did not testify to going to his aunt's house.

PCRA Court Opinion, 12/13/17, at 6-9.

On December 13, 2017, the PCRA court denied Appellant post-conviction collateral relief; Appellant then filed a timely notice of appeal. In this appeal, Appellant's counsel filed a petition to withdraw as counsel and a no-merit brief pursuant to *Turner/Finley*. Counsel presents one issue in the *Turner/Finley* brief:

> The PCRA court committed an abuse of discretion by denying relief on Appellant's newly discovered evidence claim.

*Turner/Finley* Brief at 7 (some capitalization omitted).

Prior to addressing the merits of the issue raised in the *Turner/Finley* brief, we must determine whether counsel met the procedural requirements necessary to withdraw. Counsel seeking to withdraw in PCRA proceedings

> must review the case zealously. *Turner/Finley* counsel must then submit a "no-merit" letter to the [PCRA] court, or brief on appeal to this Court, detailing the nature and extent of counsel's diligent review of the case, listing the issues which petitioner wants to have reviewed, explaining why and how those issues lack merit, and requesting permission to withdraw.
>
> Counsel must also send to the petitioner: (1) a copy of the "no-merit" letter/brief; (2) a copy of counsel's petition to withdraw; and (3) a statement advising petitioner of the right to proceed *pro se* or by new counsel.
>
> Where counsel submits a petition and no-merit letter that satisfy the technical demands of *Turner/Finley*, the court —

[the PCRA] court or this Court — must then conduct its own review of the merits of the case. If the court agrees with counsel that the claims are without merit, the court will permit counsel to withdraw and deny relief.

*Commonwealth v. Muzzy*, 141 A.3d 509, 510–511 (Pa. Super. 2016) (citations and corrections omitted).

Here, counsel fulfilled the procedural requirements necessary for withdrawing as PCRA counsel. We thus turn to the merits of the claim raised in the *Turner*/*Finley* brief and analyze whether "[t]he PCRA court committed an abuse of discretion by denying relief on Appellant's newly discovered evidence claim." *Turner*/*Finley* Brief at 7.

As we have stated:

[t]his Court's standard of review regarding an order dismissing a petition under the PCRA is whether the determination of the PCRA court is supported by evidence of record and is free of legal error. In evaluating a PCRA court's decision, our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the [hearing] level. We may affirm a PCRA court's decision on any grounds if it is supported by the record.

*Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010) (citations omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "unavailability at the time of trial of

exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." 42 Pa.C.S.A. § 9543(a)(2)(vi).

To obtain relief based on after-discovered evidence, an appellant must show that the evidence:

> (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

**Commonwealth v. Foreman**, 55 A.3d 532, 537 (Pa. Super. 2012), *citing* **Commonwealth v. Pagan**, 950 A.2d 270, 292 (Pa. 2008). To determine whether the evidence is "of such nature and character" to compel a different verdict in a new trial, a court should consider "the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." **Commonwealth v. Padillas**, 997 A.2d 356, 365 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (Pa. 2010).

In the case at bar, the PCRA court held a hearing, heard Duron Peoples testify, and specifically concluded that his testimony was "totally incredible" and untrue. PCRA Court Opinion, 12/13/17, at 10. The PCRA court explained:

> As the judge who presided over [Appellant's] trial, [the PCRA court judge was] well acquainted with the facts of the Odell Cannon ambush and shooting. The prosecution's evidence against [Appellant] at his trial was compelling, and flatly discredits the version of events given by Duron Peoples. Further, Duron's testimony was both evasive and equivocal.

- 10 -

It is wholly uncorroborated by other evidence, and contradictory of established evidence of [Appellant's] guilt. For example, Duron conjectured that [Appellant] would have used the faulty hand gun stashed by Duron in his aunt's garage in coming to Duron's aid[. However,] the weapon recovered by police from [Appellant] at the scene of Cannon's shooting was both a different gun than the one used to kill Jonas Suber, and was fully operable, having been test fired by police prior to [Appellant's] trial. . . .

[Second,] Duron's alleged phone call to [Appellant] the night Cannon was shot was inferentially contradicted by [Appellant] in his testimony during his federal trial. [Appellant] never acknowledged receiving any call from Duron. . . .

[Third, i]n his testimony, Duron offered no rational explanation as to why he would want to have [Appellant] killed, other than that the brothers did not see eye-to-eye. . . .

[Fourth, Appellant,] at trial[,] never raised the defense that Duron, and not he, was responsible for the attempt on Odell Cannon's life. . . .

[F]inally, it is apparent to the [PCRA] court that, contrary to his assertion of indifference to [Appellant's] criminal conviction, Duron, sentenced as he is to life imprisonment, has nothing to lose by providing false testimony to free [Appellant] from prison. . . .

[The PCRA court thus] find[s] Duron's testimony fantastical and made from whole cloth.

PCRA Court Opinion, 12/13/17, at 10-11.

As our Supreme Court has held, "[w]e are bound by the PCRA court's credibility findings where those determinations are supported by the record." **Commonwealth v. Small,** 980 A.2d 549, 558 (Pa. 2009). Here, the PCRA court's credibility determination – finding Duron Peoples' testimony "totally

- 11 -

incredible" and untrue – is entirely supported by the record. And, since Duron Peoples' testimony is false, it does not satisfy the after-discovered evidence standard, as it would not "likely result in a different verdict if a new trial were granted." *Pagan*, 950 A.2d at 292; *Padillas*, 997 A.2d at 365 ("before granting a new trial, a court must assess whether the alleged after-discovered evidence is of such nature and character that it would likely compel a different verdict if a new trial is granted. In making that determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction") (citations omitted). Appellant's claim on appeal thus has no merit.

Therefore, counsel complied with the procedural requirements for withdrawing as counsel and, under *Turner*/*Finley*, the issue Appellant wished to pursue in his PCRA petition is without merit.[2] Accordingly, we grant counsel's petition to withdraw and affirm the order denying Appellant post-conviction collateral relief.

Petition to withdraw as counsel granted. Order affirmed. Jurisdiction relinquished.

---

[2] Appellant filed a *pro se* response to counsel's petition to withdraw and no-merit brief. However, Appellant did not raise any additional claims in this response. *See* Appellant's Response to Counsel's Withdraw[a]l, 2/26/19, at 1-8.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/29/19